# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SERGIO MOMOX-CASELIS, individually and as Guardian Ad Litem for Maria Momox-Caselis, and SERGIO MOMOX-CASELIS and KRISTIN WOODS, as Co-Special Administrators of the estate of M.M.,<br><br>Plaintiffs<br><br>v.<br><br>MAIRA JUAREZ-PAEZ, et al.,<br><br>Defendants | Case No.: 2:16-cv-00054-APG-GWF<br><br>**Order (1) Denying Motion to Amend, (2) Denying the Plaintiffs' Motion for Summary Judgment, (3) Denying as Moot the Motion to Strike, and (4) Granting the Defendants' Motion for Summary Judgment**<br><br>[ECF Nos. 113, 125, 126, 131] |

Plaintiffs Sergio Momox-Caselis and Maria Momox-Caselis are the natural parents of deceased child M.M. The plaintiffs allege M.M. was wrongfully removed from their home, wrongfully removed from her initial foster mother's home, and placed in a neglectful foster home. M.M. died when her foster parent, Joaquin Juarez-Paez, either deliberately or accidentally gave her an overdose of medication and possibly suffocated her. The day M.M. died, Joaquin was also found dead of an overdose. His suicide note apologized for killing M.M. but asserted the child's death was not intentional.

The plaintiffs sued Joaquin and Maira Juarez-Paez, as well as various county officials involved in the foster care system. Joaquin's estate, Maira, and defendant Irene Koziki have been dismissed from the action. ECF Nos. 100, 112.

The remaining defendants (Clark County and its employees) move for summary judgment. The plaintiffs oppose, move to amend their first claim, and move for partial summary judgment on the issue of duty related to their state law claims. The defendants oppose amendment, contending it is untimely and futile. They also argue the motion for partial

summary judgment is untimely.  The defendants move to strike the plaintiffs' summary judgment brief and separate statement of facts as exceeding the page limit.  Finally, the defendants move to strike the plaintiffs' expert reports because they are unauthenticated hearsay, they are based on case law that has been overruled, and the rebuttal expert's report was untimely.

The parties are familiar with the facts, so I will not repeat them here except where necessary.  I deny the plaintiffs' motion to amend to assert their first claim under the Fourth Amendment because it would be futile.  I deny the plaintiffs' motion for partial summary judgment because it is untimely.  I grant the defendants' motion for summary judgment.  I deny the defendants' motion to strike because even considering the excess pages and exhibits, no genuine dispute remains and the defendants are entitled to judgment as a matter of law on all claims.  Although I deny the motion to strike, I caution the plaintiffs' counsel that use of a separate statement of facts to evade the page limit is inappropriate.

## I.  ANALYSIS

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531

(9th Cir. 2000). I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

### A. Count One

In count one of the second amended complaint, the plaintiffs assert a claim under 42 U.S.C. § 1983 against Clark County. They allege the Clark County Department of Family Services (DFS) removed M.M. from her natural parents' care without warning and without an immediate threat to her safety, in violation of their Fifth and Fourteenth Amendment rights. The defendants argue this claim is not properly based on the Fifth Amendment because M.M.'s removal from the home was a Fourth Amendment seizure. They also argue the removal of M.M. from the home was appropriate because Maria Momox-Caselis left the children at home unsupervised.

The plaintiffs respond by requesting leave to amend to assert this claim under the Fourth Amendment instead of the Fifth Amendment. On the merits, the plaintiffs argue the defendants did not appropriately remove the children from their natural parents' home and made no reunification efforts between M.M.'s parents and their other children until after M.M. died. The plaintiffs contend the removal from the natural parents' home was unnecessary because the problems derived from economic issues and could have been remedied through education and support of the parents.

To state a § 1983 claim, a plaintiff must allege that "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir.

2011). The defendants do not dispute they acted under color of state law. The question is whether the defendants deprived the plaintiffs of a constitutional right.

The defendants have satisfied their initial burden at summary judgment by pointing out an absence of evidence supporting the plaintiffs' first claim. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). The defendants also have presented evidence that the children were appropriately removed from the home because Maria left the children (who ranged from 2 to 12 years old) unsupervised on multiple occasions. *See* ECF Nos. 113-2; 113-41; 113-42.

The burden thus shifted to the plaintiffs to point to evidence that would raise a genuine dispute for trial. *Devereaux*, 263 F.3d at 1076. The plaintiffs have not done so. They state in their response brief that the propriety of M.M.'s removal from the home is "hotly disputed." ECF No. 124 at 5. But they do not identify the applicable law, explain how the defendants violated either the parents' Fourteenth Amendment rights or M.M.'s Fourth Amendment rights, or cite to any evidence that would raise a genuine dispute about the propriety of Clark County's actions.[1] I therefore grant the defendants' summary judgment motion as to this claim. I also deny the plaintiffs' motion to amend to alter the legal basis for their claim because amendment would be futile. *Ahlmeyer v. Nevada Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009) (stating that "futility of amendment alone can justify the denial of a motion" to amend).

**B. Count Two**

In count two, the plaintiffs assert M.M. had a due process right to basic human needs while in state custody, which the defendants violated by improperly licensing the Juarez-Paezes

---

[1] The plaintiffs also do not refute the evidence that M.M. was properly removed from the initial foster mother's home. ECF Nos. 113-5; 113-6. Nor do they identify applicable law related to Clark County's actions in removing M.M. from the initial foster mother's home, explain how Clark County violated M.M.'s rights under that law, or point to evidence in support.

as foster parents, allowing the Juarez-Paez home to host multiple young foster children who were not siblings, and by not adequately supervising the placement to ensure the home was a safe place. Count two also asserts these acts were done pursuant to official policy or longstanding practice.

The defendants argue for summary judgment on this claim because they properly followed Nevada Administrative Code section 424.160(4), which allows two children under the age of 18 months to be placed in the same foster home. They contend they made monthly visits as required, no safety concerns were noted, and there is no evidence they knew or should have known that M.M. was in danger in the Juarez-Paez home. They also contend the Juarez-Paezes were properly licensed and trained. Finally, the defendants argue there is no policy, custom, or practice that caused M.M.'s death. Alternatively, the defendants assert they are entitled to qualified immunity.

The plaintiffs respond that the defendants either had a special relationship with M.M. as a foster child or created the danger to which M.M. was exposed by placing her in the Juarez-Paez home. The plaintiffs contend the defendants failed to ensure M.M.'s safety because they (1) improperly investigated and licensed the Juarez-Paezes, (2) placed her in the Juarez-Paez foster home knowing it was a dangerous situation, (3) failed to supervise and protect her, (4) failed to attempt reunification with her natural parents or her prior foster mother, and (5) failed to properly train foster care social workers and supervisors.

Government officials performing discretionary functions may be entitled to qualified immunity for claims made under § 1983. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

1      In ruling on a qualified immunity defense, I consider whether the evidence viewed in the

2 light most favorable to the plaintiffs shows the defendants' conduct violated a constitutional

3 right. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). If so, I then determine whether the

4 defendants' conduct violated clearly established law. *Id.* I may perform this two-step inquiry in

5 any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

6      "A Government official's conduct violates clearly established law when, at the time of

7 the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable

8 official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563

9 U.S. 731, 741 (2011) (quotation omitted). The plaintiff need not identify a case "directly on

10 point, but existing precedent must have placed the statutory or constitutional question beyond

11 debate." *Id.* I make this second inquiry "in light of the specific context of the case, not as a

12 broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A defendant will be

13 entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful,

14 so long as that belief was reasonable. *Wilkins*, 350 F.3d at 955. The plaintiffs bear the burden of

15 showing the rights at issue were clearly established at the time of the defendants' actions.

16 *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009).

17      Count two alleges a due process violation. The due process clause "generally does not

18 confer any affirmative right to governmental aid, even where such aid may be necessary to

19 secure life, liberty, or property interests," nor does it "impose a duty on [the state] to protect

20 individuals from third parties." *Pate*, 648 F.3d at 971; *see also DeShaney v. Winnebago Cnty.*

21 *Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (stating the due process clause's "purpose was to

22 protect the people from the State, not to ensure that the State protected them from each other").

23

Thus, generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197.

This general rule is subject to two exceptions. A state's "omission or failure to act may give rise to a § 1983 claim" when either (1) "a special relationship exists between the plaintiff and the state (the special-relationship exception)" or (2) "the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known or obvious danger (the state-created danger exception)." *Patel*, 648 F.3d at 971-72 (quotation omitted).

"Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care . . . ." *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010) (quotation omitted). Thus, a foster child has a Fourteenth Amendment substantive due process liberty interest "in social worker supervision and protection from harm inflicted by a foster parent." *Id.* To violate this due process right, state officials must act with deliberate indifference to a danger that is known or "so obvious as to imply knowledge." *Id.* at 844 (quotation omitted). The "deliberate indifference standard, as applied to foster children, requires . . . showing [(1)] an objectively substantial risk of harm," (2) the defendants "were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed," and (3) the defendants either "actually drew that inference or . . . a reasonable official would have been compelled to draw that inference." *Id.* at 845. "[T]he subjective component may be inferred from the fact that the risk of harm is obvious." *Henry A. v. Willden*, 678 F.3d 991, 1001 (9th Cir. 2012) (quotation omitted).

"The state-created danger exception creates the potential for § 1983 liability where a state actor 'creates or exposes an individual to a danger which he or she would not have otherwise faced.'" *Campbell v. State of Wash. Dep't of Soc. & Health Servs.*, 671 F.3d 837, 845 (9th Cir.

2011) (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006)). To fall within this exception, there must be "affirmative conduct on the part of the state in placing the plaintiff in danger" and the state must act "with deliberate indifference to a known or obvious danger." *Patel*, 648 F.3d at 974 (quotation omitted). To determine whether the state-created danger exception applies, I consider: "(1) whether any affirmative actions of the official placed the individual in danger he otherwise would not have faced; (2) whether the danger was known or obvious; and (3) whether the officer acted with deliberate indifference to that danger." *Henry A.*, 678 F.3d at 1002.

The special relationship and state created danger exceptions potentially could apply in this case. The defendants had a special relationship with M.M. because she was a ward of the state as a foster child. As to state created danger, the defendants engaged in affirmative actions by placing M.M. in the Juarez-Paez home. Thus, the questions are (1) whether a reasonable jury could find the defendants acted with deliberate indifference to a known or obvious substantial risk of harm and (2) whether the defendants are entitled to qualified immunity.

1. Licensing of the Juarez-Paez Home

The plaintiffs contend the defendants were deliberately indifferent to a substantial risk of harm because they missed several red flags during the investigation and licensing of the Juarez-Paezes as foster parents. First, the plaintiffs note that Joaquin lied on his application when he stated he had no criminal history. However, the evidence shows Joaquin admitted to a citation and there is no evidence that he had a more significant criminal history. *See* ECF Nos. 113-11 at 5-7; 113-15; 132-1 at 15-16. There is no evidence that the citation had anything to do with violence or would have suggested M.M. would be in danger from Joaquin. Rather, it had to do with Joaquin not having a work card and possessing false identification, meaning he was

8

working under a false social security number. *See* ECF No. 113-15. This does not raise a genuine dispute whether M.M. faced an objectively substantial risk of harm or that the defendants acted with deliberate indifference to such a risk.

Next, the plaintiffs contend Joaquin and Maira denied in their application that they had physical problems but they both took many medications (including narcotic pain medication); Joaquin was improperly using Maira's pain medication; and Joaquin's injuries sometimes left him unable to walk, carry groceries, or pick up children. However, both Joaquin and Maira were examined by a physician who determined they were physically and emotionally fit to foster a child. ECF Nos. 113-12; 113-16. There is no evidence that Joaquin was using Maira's pain medication or that anyone told the defendants that he was. *See* ECF No. 113-19 at 6-7. Rather, the evidence shows Joaquin's condition worsened in the last few weeks before M.M.'s death. ECF Nos. 113-22 at 8-9; 128 at 28-30. There is no evidence Maira or Joaquin told the defendants about Joaquin's deteriorating physical condition and Maira did not remember doing so. ECF No. 132-5 at 14-15. Defendant Shuuandy Alvarez observed Joaquin on home visits and did not notice any physical or mental warning signs. ECF No. 132-6 at 9-10 (testifying that she saw Joaquin walk around, help with the children, hold M.M., and that he was attentive, talkative, and calm). The defendants could not be deliberately indifferent to a risk they did not know, and had no reason to know, existed. Indeed, even Maira, who lived in the home, was aware of Joaquin's condition, and observed him interact with the children, characterized the incident as unforeseeable even in hindsight. ECF No. 128 at 25 ("Q. In hindsight were there some warning signs that something like this could happen? . . . THE WITNESS: No." (objection omitted)).

Next, the plaintiffs contend the defendants should have followed up on Maira's statement during her pre-licensing physical that she was "probably okay" physically and mentally to care

for a foster child, and had they done so they would have learned Maira was inexperienced, so they would not have placed two young children in her care. However, Maira did not express she was "probably okay." Rather, the examining doctor stated that Maira was "probably okay" physically and mentally to be a foster parent. ECF No. 113-12 at 11. The plaintiffs have not raised a genuine dispute whether M.M. was at a substantial risk of harm from Maira or that the defendants were deliberately indifferent to such a risk. Maira is not the one who harmed M.M.

Next, the plaintiffs note that Joaquin did not provide a social security number on his application to be a foster parent. They contend this should have raised concerns about the stability of the placement because Joaquin previously had lost a job due to his status as an undocumented immigrant and Maira could not qualify for subsidized day care because Joaquin was working. The plaintiffs also point to the Foster Home Inspection Checklist, which shows the Juarez-Paezes planned to use non-primary caregivers yet none of those caregivers had completed the approval process. The plaintiffs argue that the file should have recorded that both Maira and Joaquin were working full time, thus impacting child care arrangements.

Whether Joaquin had a social security number does not raise a genuine dispute that M.M. would be at a substantial risk of harm in the household. Nor is there any evidence that his lack of a social security number is a risk of harm so obvious any official would have understood the placement was dangerous. The fact that Maira did not qualify for subsidized daycare does not mean the Juarez-Paezes could not have paid for daycare, or used babysitters or respite care if they needed it. ECF Nos. 113-10 at 12-13; 113-22 at 6-7; 113-37; 113-38; 132-1 at 16-17; 132-10; 132-11. The Juarez-Paezes were provided with an application to obtain assistance from the Urban League to pay for child care, but there is no evidence they sought that assistance. ECF Nos. 113-38; 113-39; 132-1 at 17. The fact that the Juarez-Paezes chose not to take advantage of

alternative child care opportunities does not amount to deliberate indifference on the defendants' part.

Finally, the plaintiffs note that the person completing the licensing forms was confusing the Juarez-Paezes with another family. There is some documentation referring to the Juarez-Paezes having two children when they had none. The plaintiffs do not explain how this has any relation to M.M.'s death or why it would raise a genuine dispute about deliberate indifference in licensing the Juarez-Paezes as foster parents.

In sum, the plaintiffs have not presented evidence raising a genuine dispute that the defendants acted with deliberate indifference in licensing the Juarez-Paezes as foster parents. Even if some combination of these factors could raise a genuine dispute, the plaintiffs have not pointed to clearly established law that would have put the defendants on notice that their conduct was unlawful. The defendants therefore are entitled to qualified immunity.

### 2. Placement of M.M. in the Juarez-Paez Home

The plaintiffs argue the defendants were deliberately indifferent to the danger M.M. faced by being placed in the Juarez-Paez home. They first argue M.M should not have been placed in the home because it already had a young foster child. This argument is based on a Clark County Resolution in which the county "commits its good faith efforts toward achievement" of certain goals. ECF No. 113-30. One of those goals was that "no more than one child under the age of 2 (except siblings) be placed in a foster home by March 31, 2008." *Id.* at 5. Nevada Administrative Code section 424.160(4) provides that "[f]oster care must not be provided for more than two children who are under the age of 18 months . . ., without the approval of the licensing authority representative." The Clark County Resolution is an aspirational goal, while the Nevada Administrative Code allows the placement of two young children in the same foster

home and would allow more with approval of the licensing authority representative. The plaintiffs have not presented evidence raising a genuine dispute whether M.M. faced a risk of substantial harm by the mere presence of another young child in the home, or that such a risk would have been obvious where the Nevada Administrative Code allows for that placement. Even if the defendants were mistaken about the lawfulness of their conduct, they would have been reasonably mistaken given the Nevada Administrative Code's provision.

The plaintiffs next argue that initial foster parent training must be completed before a child is placed in the home but the Juarez-Paezes were permitted to have three children placed in their home before their training was completed. But the evidence shows the Juarez-Paezes completed the required training before M.M. was placed in their home. ECF Nos. 113-10; 113-11 at 4; 113-12; 132-5 at 9-10. The plaintiffs rely on a statement in their expert witness's report that the training was completed on July 29, 2014. ECF No. 128 at 38; *see also* ECF No. 113-12 at 11. However, Maira testified the document showing when training was complete had the incorrect date and all training was completed before the children were in the home. ECF No. 132-5 at 9-10. That the July 29, 2014 date is a typographical error is consistent with the form itself, which was signed by Lani Aitken and the Juarez-Paezes on April 25, 2014. ECF No. 113-12 at 17, 19. Additionally, it is consistent with the case notes, which show the Juarez-Paezes took their tenth and final training class on March 29, 2014. ECF No. 113-10 at 10.

Even if it is not a typographical error, the plaintiffs do not identify any specific required training that was not completed before M.M. was placed in the home or why that would amount to an obvious risk of substantial harm. The plaintiffs also do not explain how the failure to complete training is causally connected to M.M.'s death when all training indisputably was completed before M.M.'s death.

Finally, the plaintiffs contend the defendants rushed M.M.'s placement by putting her with the first foster family to respond instead of evaluating the proper placement for her. Assuming the defendants placed her with the first foster parents to respond, that does not raise a genuine dispute that the defendants knew or should have known of an obvious risk of danger to M.M. in the Juarez-Paez home.

In sum, the plaintiffs have not pointed to evidence raising a genuine dispute whether the defendants were deliberately indifferent to a substantial risk of harm by placing M.M. with the Juarez-Paezes. Even if a combination of these factors could raise a genuine dispute as to deliberate indifference, the plaintiffs have not pointed to clearly established law putting the defendants on notice that their conduct was unlawful. The defendants therefore are entitled to qualified immunity.

### 3. Failure to Supervise and Protect M.M.

The plaintiffs contend the defendants were deliberately indifferent to the risks in the Juarez-Paez home because they failed to monitor M.M. after she was placed there. The evidence shows that while M.M. was in the care of the Juarez-Paezes, one of the defendant case workers visited M.M. in the home three times, M.M. was seen by a doctor several times, and M.M. attended regular visits with her natural mother and siblings. *See* ECF Nos. 113-2; 113-19; 113-20; 120. No one reported any signs of abuse or concerns about M.M.'s well-being.

The plaintiffs contend that just because nothing was reported does not mean there were no problems. But the plaintiffs have not presented evidence that any concerns were raised by anyone about M.M.'s placement prior to her death. Defendant Shuuandy Alvarez conducted an in-home visit less than a month before M.M.'s death and saw no warning signs. ECF No. 132-5 at 11.

The plaintiffs argue M.M. lost weight, as shown by the doctor's records, and that should have alerted the defendants to the fact that the Juarez-Paezes were not properly caring for M.M. M.M. was seen by a doctor on July 22, 2014, a loss of weight was noted, and she was scheduled for another appointment within 30 days. ECF No. 113-10 at 16. However, when M.M. was seen again on August 15, 2014, no concerns were noted other than an allergy, and she was scheduled for her next appointment three months later. ECF No. 120 at 6-7.

Finally, the plaintiffs note that Maira testified that she told defendant Lani Aitken that Joaquin was struggling and they needed help with childcare. ECF No. 128 at 18-19, 25-26. According to Maira, Aitken responded that the Juarez-Paezes did not qualify for subsidized child care. *Id.* Maira also testified the defendants knew she was working two or three jobs while taking care of the kids. ECF No. 128 at 19-22.

The struggles Maira identified were related to Joaquin not knowing which child to attend to first when both got fussy at the same time. ECF No. 132-5 at 6. Maira testified she gave Joaquin advice on how to address those kinds of problems. *Id.* There is no evidence that Joaquin was becoming physically abusive as a result of any of struggles he was having dealing with the children. To the contrary, shortly before M.M.'s death, Maira inquired about also fostering M.M's siblings. Thus, rather than signaling trouble about being overwhelmed in caring for two children with no subsidized childcare, Maira indicated to the defendants that the Juarez-Paezes were willing and able to take on more children. *See* ECF Nos. 113-19 at 6-7; 132-1 at 9-10; 132-6 at 5, 7-8. Additionally, Maira described Joaquin as "fine" on the day of the incident and that "[e]verything was like normal routine." ECF No. 132-5 at 12. As discussed earlier, Maira—who lived in the home, saw Joaquin interact with the children, and knew Joaquin best—did not see

warning signs. *Id.* at 13. A reasonable jury could not find the defendants were deliberately indifferent to a substantial risk of harm to M.M.

### 4. Failure to Attempt Reunification

The plaintiffs argue the defendants did not attempt reunification of the Momox-Caselis children with their natural parents until after M.M. died. This allegation is not in count two of the second amended complaint. Moreover, the plaintiffs do not explain how the failure to attempt reunification efforts earlier constitutes deliberate indifference to a substantial risk of harm. Nor do the plaintiffs point to any clearly established law that would put the defendants on notice that their conduct was unlawful. The defendants therefore are entitled to qualified immunity.

### 5. Failure to Train Foster Care Social Workers

The plaintiffs do not identify what training for social workers was lacking or point to evidence in support of this argument. The defendants therefore are entitled to summary judgment on this portion of count two.

### 6. Policy, Custom, or Practice

In their brief, the plaintiffs state that "[t]hrough discovery, Plaintiffs have identified official Clark County policies that were clearly inadequate in protecting M.M." ECF No. 124 at 12. However, the plaintiffs do not identify a policy, custom, or practice or point to any evidence in support of this argument. I therefore grant summary judgment on the policy, custom, or practice allegations in count two.

### 7. Summary

The plaintiffs have not pointed to evidence raising a genuine dispute whether M.M. faced a substantial risk of harm of which the defendants knew or should have known. Consequently,

no reasonable jury could find the defendants acted with deliberate indifference to M.M.'s safety. Further, the plaintiffs have not identified any clearly established law that would put the defendants on notice that their conduct was unlawful, so the defendants are entitled to qualified immunity. Finally, the plaintiffs have not identified a policy, custom, or practice that led to M.M.'s death, and have not pointed to evidence in the record in support. I therefore grant the defendants' motion for summary judgment on count two.

### C. Count Three

In count three, the plaintiffs allege defendants Clark County and Lisa Ruiz-Lee had an obligation to properly train foster care workers but failed to do so, in deliberate indifference to foster children. The defendants argue there is no evidence that the training is inadequate, the defendants acted with deliberate indifference, or the alleged lack of training deprived the plaintiffs of constitutional rights. The plaintiffs respond that they have produced evidence that Clark County policies were inadequate in protecting M.M., county employees consistently violated official policies without repercussion, and the county's own investigation showed its policies and practices are inadequate.

Contrary to their assertions, the plaintiffs have not pointed to evidence of a failure to train foster care social workers. I therefore grant the defendants' motion for summary judgment on count three.

### D. Counts Four and Six[2]

Count four alleges various defendants were negligent and violated their state statutory duty to exercise reasonable judgment and care in carrying out their responsibilities. The

---

[2] Count five alleges Maira and Joaquin Juarez-Paez were negligent in their care of M.M. This claim was asserted against only the Juarez-Paezes, so I do not address it further.

plaintiffs allege the defendants breached their duties to (1) comply with Nevada Administrative Code chapters 424 and 432B in licensing the Juarez-Paezes; (2) adequately supervise M.M. while in the Juarez-Paez home; (3) investigate violations of DFS policy by the Juarez-Paezes; and (4) exercise reasonable care in investigating the Juarez-Paez home, supervising M.M. while in the home, and not pursuing reunification efforts. Count six alleges the defendants negligently caused M.M.'s wrongful death.

The plaintiffs move for partial summary judgment on the duty element of their negligence and wrongful death claims, asserting that because M.M. was a foster child, the defendants owed her a duty as a matter of law. I deny the plaintiffs' motion because it is untimely. The scheduling order set the dispositive motion deadline for April 3, 2018. ECF No. 106 at 5. The parties stipulated three times to extend the deadline for the plaintiffs to respond to the defendants' summary judgment motion, but none of those stipulations included an extension of the dispositive motion deadline. *See* ECF Nos. 116, 118, 122. I granted a fourth extension to file the response, but I did not grant an extension of the dispositive motion deadline. ECF No. 127. The plaintiffs filed the countermotion on May 21, 2018, well beyond the deadline.

The defendants move for summary judgment on these two claims, arguing they are entitled to discretionary immunity. Alternatively, they argue the plaintiffs fail to identify any provision of state law that they violated. The plaintiffs respond that the defendants' failures were addressed in relation to the federal claims. The plaintiffs also argue that the defendants are not entitled to discretionary immunity.

A plaintiff asserting a negligence claim in Nevada must show "(1) an existing duty of care, (2) breach, (3) legal causation, and (4) damages." *Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1175 (Nev. 2008) (en banc) (quotation omitted). Nevada state law grants

discretionary act immunity to certain governmental actors. Nevada Revised Statutes § 41.032(2) states that "no action may be brought under NRS 41.031 or against . . . an officer or employee of the State or any of its agencies or political subdivisions which is . . . [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused." Section 41.032(2) thus "grants the State and its political subdivisions sovereign immunity from civil liability when the challenged act was discretionary in nature." *Ransdell v. Clark Cty.*, 192 P.3d 756, 761 (Nev. 2008) (en banc). "[G]overnment actions fall within the scope of discretionary-act immunity when they (1) involve an element of individual judgment or choice, and (2) are based on considerations of social, economic, or political policy." *Id.* at 762 (quotation omitted).

### 1. Clark County

The parties dispute whether defendant Clark County is the type of defendant that is entitled to discretionary act immunity. The plaintiffs cite no law for their argument that Clark County's actions are not subject to discretionary act immunity. The Supreme Court of Nevada has previously granted Clark County discretionary act immunity. *See id.* at 764. The plaintiffs do not identify any act Clark County took independent of the other defendants, who are Clark County employees. Because, as discussed below, the county's employees are entitled to summary judgment on the state law claims, so is Clark County.

### 2. Lisa Ruiz-Lee and Tara Donahue

The plaintiffs argue defendants Lisa Ruiz-Lee and Tara Donahue created policy and therefore cannot be immune under discretionary immunity. The defendants respond that the

18

plaintiffs have not identified what policy Ruiz-Lee and Donahue created that led to M.M.'s death.

The plaintiffs cite no law for the proposition that a defendant who makes policy is not entitled to discretionary immunity. Additionally, the plaintiffs do not identify what policy they claim these defendants promulgated, how these defendants acted negligently in creating the policy, or how any such policy proximately caused M.M.'s death. It is impossible for me to conduct a discretionary immunity analysis because the plaintiffs have not presented enough argument or evidence for me to even identify what it is these defendants allegedly did wrong. Because there is no evidence the defendants were negligent or engaged in conduct for which they would not be entitled to discretionary immunity, I grant their motion as to these two defendants.

### 3. Jeremy Law

The plaintiffs argue defendant Jeremy Law is not entitled to immunity for embellishing his investigative findings that resulted in M.M. being removed from her initial foster mother's home. The defendants respond that the plaintiffs cite no law for the proposition that writing a report with "skewed facts" is not discretionary. The defendants also argue there is no evidence the facts were skewed.

Law investigated allegations made by another foster child about M.M.'s initial foster parent. That boy asserted that the foster father gave him "pow pows," which were either slaps or spankings. ECF Nos. 113-5; 113-6; 132-24. Decisions about how to investigate a report of child abuse and whether to recommend a child be removed from an allegedly abusive home involve individual judgment or choice and are based on considerations of social, economic, or political policy related to the care and protection of foster children. *See Gonzalez v. Las Vegas Metro. Police Dep't*, No. 61120, 2013 WL 7158415, at *2 (Nev. Nov. 21, 2013) (holding that police

decision to arrest or detain a suspect based on a warrant involved individual judgment and was "in furtherance of public policy goals, including the apprehension and arrest of wanted criminals pursuant to a facially valid warrant"). Even if the plaintiffs are correct that an investigator nevertheless has no discretion to present a "skewed" version of the facts in a written report (a proposition for which the plaintiffs cite no law and conduct no analysis), the plaintiffs present no evidence that Law "skewed" the facts. To the contrary, the findings of physical discipline were upheld by a hearing officer for the Clark County DFS. ECF No. 113-28 at 8. I therefore grant the defendants' motion as to Law.

### 4. Patricia Meyers and Shuuandy Alvarez

As to defendants Patricia Meyers and Shuuandy Alvarez, the plaintiffs argue their failure to train the Juarez-Paezes and failure to report dangerous conditions in the home were not discretionary. The plaintiffs also argue Alvarez had a non-discretionary duty to perform monthly checks on M.M., and Meyers had the non-discretionary obligation to ensure Alvarez conducted the monthly checkups. The defendants respond that these two defendants were not responsible for training the Juarez-Paezes and they could not report dangerous conditions in the home because they saw none. The defendants admit that Alvarez's last home visit was not timely, but they argue that has no causal connection to M.M.'s death because the last visit occurred before M.M.'s death, Alvarez saw no signs of abuse during the visit, and M.M. saw her natural parents after that and they did not report any concerns.

The plaintiffs do not point to any evidence that either of these defendants had the responsibility to train the Juarez-Paezes and failed to do so before children were placed in the home. As discussed above, the evidence shows the training was completed before M.M. was placed in the home and well before her death.

The plaintiffs also have not identified what dangerous conditions in the home these defendants were required to report. There is no evidence they observed or were aware of a dangerous condition in the home.

Finally, even if Alvarez's last visit was untimely, and thus a violation of a non-discretionary duty to check on M.M. every 30 days, the plaintiffs do not explain how that is causally connected to M.M.'s death. Alvarez saw no warning signs on any of her visits. M.M.'s parents had visits with her after Alvarez's last visit and there is no evidence they noticed anything amiss. As discussed above, even on the very day of the incident Maira did not detect any warning signals about what was going to happen. The timing of the last visit thus had no causal connection to M.M.'s death. I therefore grant the defendants' motion as to Meyers and Alvarez.

### 5. Lani Aitken

The plaintiffs argue that although licensing may involve some discretionary decisions, there are mandatory requirements before a foster home may be licensed, and Lani Aitken's decision to place the children in the Juarez-Paez home before they completed the training was not discretionary. The defendants respond that all requirements for licensing, including training, were completed before M.M. was placed in the Juarez-Paez home.

As discussed previously, there is no evidence from which a reasonable jury could conclude that the children were placed in the home before training was completed. The plaintiffs do not identify what other mandatory steps were not completed and they cite no supporting evidence. I therefore grant the defendants' motion as to Aitken.

/ / / /

/ / / /

## II. CONCLUSION

IT IS THEREFORE ORDERED that the plaintiffs' motion to amend **(ECF No. 125) is DENIED**.

IT IS FURTHER ORDERED that the plaintiffs' motion for partial summary judgment **(ECF No. 126) is DENIED**.

IT IS FURTHER ORDERED that the defendants' motion to strike **(ECF No. 131) is DENIED**.

IT IS FURTHER ORDERED that the defendants' motion for summary judgment **(ECF No. 113) is GRANTED**. The clerk of court is instructed to enter judgment in favor of defendants Clark County, Tara Donohue, Lisa Ruiz-Lee, Kim Kallas, Patricia Meyers, Jeremy Law, Shuuandy Alvarez, Lani Aitken, and Oscar Benavides and against the plaintiffs.

DATED this 26th day of December, 2018.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE